UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-CR-80062-RAR

UNITED STATES OF AMERICA

vs.

JOSE A. AMAN,

      Defendant.

_____/

## ORDER GRANTING SECOND MOTION FOR COMPASSIONATE RELEASE

**THIS CAUSE** comes before the Court upon Defendant Jose A. Aman's Second *Pro Se* Motion for Reduction of Sentence pursuant to 18 U.S.C. § 3582(c)(1)(A) ("Motion"), [ECF No. 53]. The Court having carefully reviewed the Motion; the Government's Response in Opposition ("Response"), [ECF No. 54]; Defendant's Reply in Support ("Reply"), [ECF No. 56]; Defendant's Supplemental Brief ("Supplement"), [ECF No. 65]; Defendant's Status Report Resolving Immigration Detainer ("Status Report"), [ECF No. 69]; the Government's Response in Opposition to Defendant's Supplement (Supplemental Response"), [ECF No. 70]; Defendant's Supplemental Reply ("Supplemental Reply"), [ECF No. 71]; Defendant's First *Pro Se* Motion for Compassionate Release ("First Motion"), [ECF No. 41]; the record; and being otherwise fully advised, it is hereby

      **ORDERED AND ADJUDGED** that Defendant's Motion, [ECF No. 53], is **GRANTED** as set forth herein.

## BACKGROUND

### I. The First Motion

Defendant filed his First Motion seeking compassionate release on August 30, 2022. *See* [ECF No. 41]. The following facts are recounted in substantially the same form as they were in the Court's September 30, 2022 Order Denying that First Motion ("First Order"), [ECF No. 50].

In August 2020, Defendant was charged by information with wire fraud, in violation of 18 U.S.C. § 1343, [ECF No. 1]. The scheme for which Defendant was charged and pleaded guilty is described more fully in the Factual Proffer ("Proffer"), [ECF No. 14], and briefly summarized here. Essentially, Defendant and his business partners solicited individuals throughout the United States and Canada to invest in contracts for diamonds, which Defendant promised he would cut, polish, and resell at a high profit. *See generally* Proffer. The contracts, however, were fraudulent. *See generally id.* And they formed the basis of a Ponzi scheme that lasted from May 2014 through May 2019. *Id.* at 5. The scheme resulted in approximately $24 million in losses to over 200 victims. *Id.* Defendant used these fraudulently procured proceeds to enrich himself and support his lavish lifestyle. *Id.*

Unrelatedly, in August 2019, Defendant's now-23-year-old son Joseph Aman ("Joey"), experienced a horrific ATV accident in Virginia, resulting in severe brain damage, a broken jaw, and myriad other complications which left him in a persistent vegetative state. *See* [ECF No. 41-1] at 2–3. And as the Court noted at Defendant's sentencing, the accident occurred after the conclusion of Defendant's involvement in the fraud scheme for which he was ultimately convicted. *See* Sentencing Transcript, [ECF No. 31] at 31:5–31:11. Indeed, at the time of Joey's accident in August 2019, Defendant was by then cleaning carpets and already cooperating with the corporate monitor to locate and recover funds stolen as a result of the scheme. *See* Sent. Trans. at 16:24–19:9. After the accident, Defendant's First Motion recounted in vivid detail the long hours over many days that he stayed by Joey's bedside, advocating for him with medical providers, and aiding in his convalescence. *See generally* First Mot. After initially receiving treatment at Reston Hospital, in October 2019, Joey was transferred to Woodbine Nursing Facility in Virginia. *See* [ECF No. 41-1] at 131 –132.

On September 21, 2020, Defendant pleaded guilty as charged in the information. [ECF Nos. 11, 13]. On December 8, 2020, the Court sentenced the Defendant. *See* [ECF No. 29]. Though Defendant did not object to his guidelines calculations, he did request a downward variance, citing several factors, including his son's accident as well as the caregiving challenges associated with it. *See generally* Sentencing Memorandum, [ECF No. 21]. The Government objected, citing several cases where similarly situated defendants received significant sentences. Sent. Trans. at 6:15–9:20. The Government acknowledged the difficult situation with Defendant's son but argued it was not a sufficient reason to grant a downward variance. *See id*. The Court acknowledged Defendant's commitment to assisting with Joey's care but also noted that Defendant had defrauded approximately 240 people out of many millions of dollars. *Id.* at 10:24–15:19. In denying Defendant's request for a downward variance, the Court explained that it could not look at the son's "accident, separate and apart from [the] Ponzi scheme, as a method by which to reduce the sentence . . ., because doing so would not promote respect for the law, given the seriousness of this offense." *Id.* at 31:12–31:16. To do so, the Court observed, "would completely undercut any concept of general deterrence." *Id.* at 31:17.

After balancing the material considerations, the Court sentenced Defendant to 84 months' imprisonment, which fell toward the middle of the guidelines range of 78 to 97 months. *Id.* at 33:10–33:21. The Court also ordered three years of supervised release, imposed a $100 special assessment, and ordered Aman to pay $23,866,340 in restitution. *Id.* at 39:5–39:7. To accommodate Defendant's strong desire to remain near the bedside of his recovering son, the Court extended Defendant's surrender date on three separate occasions. *See id.* at 41:14–42:13; [ECF Nos. 35, 37]. Defendant ultimately surrendered on June 10, 2021. *See* [ECF No. 37]; [ECF No. 70-1] at 3. On October 27, 2021, a court in Virginia appointed Christopher T. Mays, Esq. and Sandra Aman Wong ("Ms. Wong"), the Defendant's sister, as co-guardians for Joey. *See* [ECF

No. 41-1] at 179–81. The exhibits accompanying Defendant's First Motion indicate that after her appointment as co-guardian, Ms. Wong took an active role in overseeing, managing, and advocating for Joey. *Id.* at 184, 186.

As noted above, the instant Motion represents Defendant's second request for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A). Defendant filed his First Motion on August 29, 2022. The First Motion argued that Defendant's situation presented extraordinary and compelling circumstances due to (1) the incapacitation of his adult son Joey; (2) the challenges and risks related to COVID-19; and (3) Defendant's alleged rehabilitation while incarcerated. *See* First Mot. at 41–46. On September 30, 2022, the Court denied Defendant's First Motion based upon its determination that Defendant had failed to sufficiently demonstrate "extraordinary and compelling" family circumstances under the previous version of § 1B1.13, the Sentencing Guidelines' Policy Statement governing motions for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A). First Order at 4–6. The Court similarly rejected Defendant's COVID-19 and rehabilitation arguments for failing to qualify under § 1B1.13's specifically enumerated "extraordinary and compelling" bases warranting compassionate release. *Id.* at 6–8. Having determined the "Defendant ha[d] not cleared the § 3582(c)(1)(A)(i) threshold for 'extraordinary and compelling reasons' to reduce his sentence" the Court refrained from analyzing the 18 U.S.C. § 3553(a) factors. *Id.* at 8.

## II. The Second Motion

Defendant filed the instant Motion on December 15, 2023, a little over a year after the Court denied his First Motion. *See* [ECF No. 53]. In this Motion, Defendant acknowledges his First Motion "was denied in September of 2022" but that "due to a change in circumstances 'extraordinary and compelling reasons' now exist that warrant relief." Mot. at 2. And it cannot

be denied that the factual, legal, and procedural landscapes have each changed substantially since the Court's First Order.

*Factually,* the following developments have occurred since the Court denied Defendant's First Motion in September 2022.[1]   First, in December 2022, Joey was relocated from Woodbine Nursing Facility in Virginia to Ms. Wong's home in Miami.  Supp. at 5.  But the same day he arrived at Ms. Wong's home, he had to be admitted to Jackson Hospital with fever and lethargy. *Id.*  Joey remained in the hospital for two months, during which time he was placed on oxygen. *See id.*  While there, providers developed a plan of care with Ms. Wong.  *See id.*  Joey eventually returned to Ms. Wong's home in February 2023 but was hospitalized twice more in 2023 due to respiratory and feeding complications.  *Id.*  On February 4, 2024, Joey again suffered life-threatening respiratory failure requiring emergency hospitalization at Jackson South Medical Center.  *Id.* at 6.  When medical officials arrived at Ms. Wong's home, Joey's oxygen levels were so low they had to perform life-saving treatment on him outside her home.  *Id.*  In fact, upon arriving at the hospital, a doctor informed Ms. Wong that Joey was unlikely to survive the day.  *Id.*

Over the following weeks, medical staff attempted to ween Joey off the ventilator keeping him alive, but their efforts were unsuccessful, and his condition worsened.  *Id.*  Accordingly, on March 1, 2024, the director of the Intensive Care Unit at Jackson South advised in a letter that Joey's condition was "critical [] and his prognosis poor," and concluded that he "may not survive this hospital stay."  [ECF No. 59] at 4.  The letter further explained that Joey was "on mechanical ventilation, [in a] medically induced coma, and on intravenous medication to maintain his blood pressure."  *Id.*

---

[1] These factual developments are primarily derived from Defendant's Motion, Defendant's Supplement, which includes a sworn declaration from Ms. Wong ("Wong Decl."), [ECF No 65-1]; Defendant's Status Report Resolving Immigration Detainer ("Status Report"), [ECF No. 69], along with the attached documents from Immigration and Customs Enforcement, [ECF No. 69-1]; and Defendant's Supplemental Reply, which includes a Second Declaration from Ms. Wong ("Wong Second Decl."), [ECF No. 71-1], along with medical records substantiating her own medical challenges, [ECF No. 71-2].

Joey's condition stabilized over the coming days, but he remained dependent on the ventilator. Supp. at 6. Eventually the hospital performed a tracheotomy. *Id.* On March 11, 2024, still unable to come off the ventilator, Joey was transferred to Kindred Hospital in Hollywood, where he remained dependent on oxygen delivered to him through the tracheotomy. *Id.* Kindred staff further informed Ms. Wong that if Joey is disconnected from the oxygen, he will die. *Id.* Accordingly, Frank Gomez, the director of the respiratory department at Kindred, informed Ms. Wong that Joey could not be left alone at all and would require around-the-clock monitoring because of his dangerously low oxygen levels. *Id.* at 6–7. Due to insurance complications, Joey was apparently discharged and released to Ms. Wong's care on April 8, 2024. *See id.* at 7.

Emergencies persist. On May 16, 2024, for example, Joey was hospitalized again—this time for seizures, and he is now administered an anti-seizure medication in addition to his other treatments and medications. *See* Supp. Reply at 3. Joey's current condition requires 24/7 medical care to monitor his oxygen levels. *Id.* In addition, every six hours, Joey's phlegm must be suctioned to prevent him from choking to death. *Id.* Changing Joseph's tracheotomy is also a difficult process requiring two people. *Id.* Meanwhile, Ms. Wong never gets a full night's sleep because Joseph's machine alerts her at least 3-4 times a night, and she must check his oxygen and clean his tracheotomy. *Id.* Some nights, she barely sleeps at all. *Id.*

On top of managing Joey's continued medical challenges, Ms. Wong is also managing several additional family and health challenges of her own. For example, all four of Ms. Wong's children live in her home along with her elderly husband, who has his own health issues. Supp. at 8. Two of Ms. Wong's children are also disabled. *Id.* And Ms. Wong has her own serious health conditions too. *See* Supp. at 7–8 ("Type 2 diabetes mellitus, chronic kidney disease stage IV, mixed hyperlipidemia, long-term insulin use, chronic obstructive pulmonary disease, hypothyroidism, and obesity"); [ECF No. 71-2]. In addition to these health conditions, the

medications Ms. Wong takes to treat them further inhibit her ability to provide care for Joey. *See id.* at 7. And due to her full-time caretaking duties, Ms. Wong has also been unable to stay current on her scheduled medical appointments to monitor and treat these conditions. *See id.* For example, she is overdue on follow-up tests relating to her kidney disease, *id.* at 7–8, and she was recently hospitalized with a lump in her neck/thyroid area. Supp. Reply. at 3. Ms. Wong is still awaiting a diagnosis as to the latter condition, which her doctors suspect is serious. *See id.*

*Legally*, in the period after the Court entered its First Order, Amendment 814 to the Sentencing Guidelines went into effect.[2] As explained more fully herein, Amendment 814 significantly alters the compassionate release framework governing 18 U.S.C. § 3582(c)(1)(A)(i) motions like this one.

*Procedurally*, the major factual and legal changes catalogued above gave rise to several additional developments. First, as already noted, Defendant filed his Second Motion on December 15, 2023. The Government filed a Response in Opposition to Defendant's Second Motion on December 29, 2023. *See* [ECF No. 54]. Defendant filed a Reply in Support on February 13, 2024. *See* [ECF No. 56]. Three days later, on February 16, 2023, the Government filed a Notice indicating all the victims of Defendant's fraud scheme had been notified of his request for compassionate release, and all 13 of the responding victims indicated their opposition to Defendant's early release. *See* [ECF No. 57]. On March 18, 2024, after its initial review of this Motion, the Court entered an Order to Show Cause, [ECF No. 60], directing Defendant to confirm he had exhausted his administrative remedies as 18 U.S.C. § 3582(c)(1)(A) requires. Defendant timely responded to the Order to Show Cause, [ECF No. 61], and attached an email response from the Bureau of Prisons ("BOP") indicating (1) that BOP was in receipt of Mr. Aman's Motion; (2)

---

[2] U.S. Sent'g Comm'n, Amendments to the Sentencing Guidelines, 88 Fed. Reg. 28,254 (effective Nov. 1, 2023).

that BOP would not be exercising its authority to file a motion on Defendant's behalf; and (3) Defendant "was not required to exhaust administrative remedies" and that he "may file a motion requesting a sentence reduction . . . directly with the court that imposed [his] sentence." [ECF No. 61] at 4.

On April 2, 2024, now satisfied Defendant had exhausted his administrative remedies[3] and recognizing the novel and complex situation arising from the deterioration in Joey's medical condition, the adverse developments related to the continued availability of Ms. Wong as Joey's caregiver, and the recent significant changes to U.S.S.G. § 1B1.13, the Court appointed counsel from the Federal Public Defender's office to assist with Defendant's Motion.  *See generally* Appointment Order, [ECF No. 63].  The Court also permitted supplemental briefing from appointed counsel in support of Defendant's Motion—which Defendant had originally filed *pro se*—and directed that, in the event appointed counsel filed such supplemental briefing, the Government had to respond "within seven (7) days indicating whether and why the Government still opposes Defendant's requested sentence reduction."  Appt. Order at 5.

On April 6, 2024, Defendant's newly appointed counsel timely submitted a Supplement to Defendant's Motion on an expedited basis.  *See generally* Supp.  Defendant's counsel also attached a sworn declaration from Ms. Wong ("Wong Decl."), [ECF No 65-1], substantiating the factual assertions contained in the Supplement.  On April 12, 2024, before the Government filed any Response, the United States Probation Office ("USPO") informed the Court that Defendant's then-pending immigration detainer prevented the Court from modifying Defendant's sentence to home detention or to extended supervised release as Defendant's Motion and Release Plan had requested, *see* [ECF No 55].  Accordingly, the same day, the Court entered a Paperless Order directing

---

[3]  As noted in the Court's Appointment Order, [ECF No. 63], "[t]he Court is accordingly satisfied that Defendant has adequately exhausted his administrative remedies here."  Appt. Order at 2.

Defendant's counsel to "provide the Court with Notice that includes: (1) Defendant's current and projected immigration status; (2) a proposed plan for resolving the detainer issue; (3) and a sufficiently detailed release plan taking into account Defendant's current and projected immigration status[.]"  [ECF No. 66].

On May 13, 2024, Defendant's counsel timely filed the required Notice Regarding Immigration Issues ("Notice"), [ECF No. 67], in which Defendant's counsel informed the Court that "potential resolution of the [detainer] issue remain[ed] in progress" and provided additional details as to this planned resolution.  *See generally* Notice.  Given the Notice, on May 14, 2024, the Court deferred ruling on Defendant's Motion and directed Defendant's counsel to file a status report on or before June 14, 2024 updating the Court as to Defendant's immigration status.  [ECF No. 68].  On June 7, 2024, Defendant's counsel timely filed the required immigration status report and informed the Court that "[a]fter reviewing the medical records relating to Mr. Aman's son, and after conducting two in-person interviews with Mr. Aman, Immigration and Customs Enforcement has elected to lift his detainer and release him on his own recognizance, subject to certain conditions."  [ECF No. 69].

On June 12, 2024, the Government filed its Response in Opposition to Defendant's Motion. [ECF No. 70].  On June 13, 2024, Defendant filed a Supplemental Reply in Support of the Motion. [ECF No. 71].  Finally, the Court notes that as of June 12, 2024, Defendant has served over half of his statutory sentence.  *See* [ECF No. 70-1] at 3.

## LEGAL STANDARD

Generally, "[a] 'court may not modify a term of imprisonment once it has been imposed except' in certain circumstances established by statute or rule."  *United States v. Handlon*, No. 22-13699, at 4 (11th Cir. Apr. 3, 2024) (quoting 18 U.S.C. § 3582(c)); *see also United States v. Giron*, 15 F.4th 1343, 1345 (11th Cir. 2021).  Title 18, § 3582(c)(1)(A) of the United States Code—

commonly referred to as the "compassionate release" provision—is one such statutory exception to the general rule.  *See Handlon*, No. 22-13699, at 4 (citing *Giron*, 15 F.4th at 1345).  This statutory provision authorizes courts, in relevant part, to reduce a defendant's term of imprisonment for "extraordinary and compelling reasons."  *Id.*; *see also* 18 U.S.C. § 3582(c)(1)(A)(i).[4]

In 2018, Congress passed the First Step Act ("FSA"),[5] § 604 of which expanded "who [could] file a Section 3582(c)(1)(A) motion" to allow for defendant-filed motions, where previously, only the Bureau of Prisons ("BOP") could file them.  *See United States v. Bryant*, 996 F.3d 1243, 1258–59 (11th Cir. 2021).  However, Congress "chose not to lift its stricture that courts must follow the [United States Sentencing] Commission's applicable policy statements when ruling on [§ 3582(c)(1)(A) compassionate release] motions."  *Id.* at 1259.  Thus, as modified by the FSA, § 3582(c)(1)(A) now provides:

> [T]he court, upon motion of the Director of the [BOP], or upon motion of the defendant after the defendant has fully exhausted all administrative rights . . . may reduce the term of imprisonment . . . , after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction *is consistent with* applicable *policy statements* issued by the Sentencing Commission.

18 U.S.C. § 3582(c)(1)(A) (emphasis added).

---

[4] Section 3582(c)(1)(A)(ii) alternatively allows for a sentence reduction where "the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g)."  18 U.S.C. § 3582(c)(1)(A)(ii).  Here, because Defendant is not 70 years of age and has not served 30 years in prison, subsection (ii) is inapplicable.

[5] First Step Act of 2018, Pub. L. No. 115–391, 132 Stat. 5194.  The First Step Act was enacted on December 21, 2018.

With respect to the applicable policy statements referenced in § 3582(c)(1)(A), 28 U.S.C. § 994(t) commands that "[t]he Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples. Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." And as the Eleventh Circuit has noted, "the Commission did [so in promulgating] 1B1.13, which is entitled 'Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A).'" *Bryant*, 996 F.3d at 1247. Thus, the § 1B1.13 Policy Statement governs courts' consideration of compassionate release motions filed under § 3582(c)(1)(A). *See id.*

Notably, in April 2023, the Sentencing Commission passed Amendment 814—effective November 1, 2023—which implemented a series of long-awaited updates to the § 1B1.13 Policy Statement,[6] including (1) moving the list of circumstances that qualify as "extraordinary and

---

[6] By way of background, the Court notes that for several years after the passage of the FSA, the Sentencing Commission lacked the requisite quorum to update § 1B1.13 in accordance with the FSA's changes to the compassionate release provision codified at § 3582(c)(1)(A). Thus, "before November 1, 2023, the Sentencing Commission's only guidance on this point had been promulgated prior to the enactment of the First Step Act." *United States v. Padilla*, No. 16 CR. 317-04 (PAE), 2024 WL 749566, at *3 (S.D.N.Y. Feb. 23, 2024). But after Congress changed the statute to allow defendants to file motions in addition to the BOP, a circuit split emerged concerning whether § 1B1.13 constituted an "applicable policy statement" for defendant-filed motions, since the policy statement, quoting the pre-existing statute's language, began with the phrase "[u]pon motion of the Director of the Bureau of Prisons." *Bryant*, 996 F.3d at 1247. As a result, some circuits determined that § 1B1.13 was not an "applicable policy statement" binding judicial discretion as to defendant-filed motions, effectively affording courts in these circuits great discretion, under Application Note 1(D), concerning whether to grant or deny compassionate release motions. *Id.* at 1248. Other circuits, including the Eleventh Circuit, continued to consider § 1B1.13 an applicable policy statement for all § 3582(c)(1)(A) motions, notwithstanding the former version of § 1B1.13's prefatory phrase "[u]pon motion of the Director of the Bureau of Prisons." *Id.* (holding, "[i]n short, 1B1.13 is an applicable policy statement for all Section 3582(c)(1)(A) motions, and Application Note 1(D) does not grant discretion to courts to develop 'other reasons' that might justify a reduction in a defendant's sentence."). Accordingly, prior to November 1, 2023, the law in the Eleventh Circuit was that § 1B1.13 Application Note 1(D) did not grant courts discretion to develop their own "other reasons" that might justify a reduction in a defendant's sentence beyond those articulated by the BOP. *See id.* However, in light of Amendment 814's recent changes to § 1B1.13, this circuit split now appears to be moot, since the new § 1B1.13 moves the circumstances constituting extraordinary and compelling reasons from the commentary into the text of the §1B1.13 Policy Statement itself; brings the language of § 1B1.13 in line with the FSA;

compelling" from the Application Notes in § 1B1.13's Commentary to a standalone subsection placed within the main body of the § 1B1.13 Policy Statement; (2) expanding the list of "extraordinary and compelling reasons," which *inter alia*, (a) retitled the "Medical Circumstances" category and added various additional subcategories; (b) significantly expanded the "Family Circumstances" category by adding additional subcategories; (c) added a new "Victim of Abuse" category; (d) significantly expanded the "Other Reasons" category to  preserve judicial discretion to decide compassionate release motions, whether BOP or defendant filed, provided that such other circumstances, "when considered by themselves or together with any of the reasons" listed in § 1B1.13 "are similar in gravity"; and (e) added an "Unusually Long Sentences" category, which permits courts to consider non-retroactive changes in law under a specific set of circumstances. *Compare* U.S.S.G. § 1B1.13 (Nov. 2023)[7] *with* U.S.S.G. § 1B1.13 (Nov. 2018); *see also Prada*, No. 22-13059, at 6–7.

Thus, as modified, the new § 1B1.13 identifies the following six circumstances, when considered individually or in combination, that permit the court to reduce a term of imprisonment under § 3582(c)(1)(A): (1) Medical Circumstances of the Defendant; (2) Age of the Defendant; (3) Family Circumstances of the Defendant; (4) Victim of Abuse; (5) Other Reasons; and (6) Unusually Long Sentence.  U.S.S.G. § 1B1.13(b)(1)–(6); *see also Prada*, No. 22-13059, at 6–7. But before granting such motions, § 1B1.13 further requires courts to determine that "[t]he

---

and removes the ambiguity from the previous version of § 1B1.13.  *See United States v. Prada*, No. 22-13059, at 6–7 (11th Cir. Mar. 27, 2024) (per curiam) (stating "[t]he Sentencing Commission amended § 1B1.13 to clarify that it is applicable to motions by defendants and move[d] the definition of 'extraordinary and compelling reasons' to the text of the Guidelines."); *see also Handlon*, No. 22-13699, at 8–9 (explaining that "[t]he 2023 amendment to § 1B1.13 altered the text of the guideline itself to allow for compassionate release in [] new circumstance[s].").  Accordingly, § 1B1.13 now controls courts' evaluation of all compassionate release petitions, whether BOP or defendant initiated, and expands the list of extraordinary and compelling reasons courts may consider in evaluating them.

[7] U.S. Sent'g Comm'n, Amendments to the Sentencing Guidelines, 88 Fed. Reg. 28,254 (effective Nov. 1, 2023).

defendant is not a danger to the safety of any other person or to the community." U.S.S.G. § 1B1.13(a)(2); *see also Handlon*, No. 22-13699, at 4–5.

However, even if one or some combination of the extraordinary and compelling reasons listed above is present, the Court must still determine that a sentence reduction remains consistent with "the factors set forth in section 3553(a) to the extent that they are applicable" before a sentence reduction is proper. *See Handlon*, No. 22-13699, at 5; *see also* 18 U.S.C. § 3582(c)(1)(A). Thus, under § 3582(c)(1)(A)(i), the district court may reduce a movant's term of imprisonment if: (1) there are "extraordinary and compelling reasons" for doing so, (2) the factors listed in § 3553(a) favor doing so, and (3) doing so is consistent with the policy statements in § 1B1.13. *See United States v. Tinker*, 14 F.4th 1234, 1237 (11th Cir. 2021); *see also Handlon*, No. 22-13699, at 5. If the district court finds against the movant on any one of these requirements, it cannot grant relief, and need not analyze the other requirements. *See Giron*, 15 F.4th at 1347–48; *Tinker*, 14 F.4th at 1237–38 (explaining that "nothing on the face of 18 U.S.C. § 3582(c)(1)(A) requires a court to conduct the compassionate-release analysis in any particular order."). The defendant bears the burden of establishing that compassionate release is warranted. *See United States v. Colonna*, 535 F. Supp. 3d 1291, 1297 (S.D. Fla. 2021) (citing *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013)); *see also United States v. Heromin*, No. 11-55033, 2019 WL 2411311, at *2 (M.D. Fla. June 7, 2019) (assigning defendant burden of proof after the implementation of the First Step Act).

Finally, for defendant-filed motions brought under § 3582(c)(1)(A), the defendant must first meet the statute's administrative exhaustion requirement. *Handlon*, No. 22-13699, at 4; *see also* 18 U.S.C. § 3582(c)(1)(A).

## ANALYSIS

Defendant's Motion seeks compassionate release under § 3582(c)(1)(A). As a threshold matter, because the Court has already determined that Defendant has properly exhausted his

administrative remedies in compliance with § 3582(c)(1)(A), *see* Appt. Order at 2, the Court need not address the Government's supplemental argument on this point.  The Court accordingly proceeds directly to consider Defendant's Motion on the merits.  And as explained below, the Court concludes that Defendant has both demonstrated "extraordinary and compelling" circumstances under § 1B1.13(b) and that the § 3553(a) factors militate in favor of compassionate release.  The Court discusses each in turn.

## I.   Defendant Has Demonstrated Extraordinary and Compelling Reasons

Defendant's Motion and its accompanying supplemental filings maintain that Defendant has adduced "extraordinary and compelling" circumstances under both § 1B1.13(b)(3)'s "Family Circumstances of the Defendant" category and (b)(5)'s "Other Reasons" catchall category.  *See* Supp. at 5–10.  Defendant's Motion also reprises the argument from his First Motion concerning Defendant's alleged rehabilitation during his incarceration.  *See* Mot. at 4–6.  After reviewing Defendant's Motions, along with his supplemental filings, the Court finds that Defendant has sufficiently established extraordinary and compelling circumstances under both § 1B1.13(b)(3) and (b)(5).

### A.  Defendant Qualifies Under U.S.S.G. § 1B1.13(b)(3)

Defendant primarily argues that his circumstances qualify as "extraordinary and compelling" under § 1B1.13(b)(3)'s "Family Circumstances of the Defendant" category because he is now the only caregiver available to care for Joey, his completely incapacitated 23-year-old son. *See* Supp. at 5–10.

As explained above, via Amendment 814, the Sentencing Commission significantly expanded the range of family circumstances constituting extraordinary and compelling reasons for purposes of evaluating motions like Defendant's filed under § 3582(c)(1)(A).  *Compare* U.S.S.G. § 1B1.13(b)(3) (Nov. 2023) *with* U.S.S.G. § 1B1.13 cmt. n.1(C) (Nov. 2018).  Under the former

version of § 1B1.13, in determining whether a defendant's family circumstances were sufficiently

extraordinary and compelling, courts could consider only the following two circumstances:

> i) The death or incapacitation of the caregiver of the defendant's
> minor child or minor children.

> (ii) The incapacitation of the defendant's spouse or registered
> partner when the defendant would be the only available caregiver
> for the spouse or registered partner.

U.S.S.G. § 1B1.13 cmt. n.1(C) (Nov. 2018).  The range of circumstances in which Application

Note 1(C) applied was thus narrowly circumscribed.

Amendment 814 relocated the family circumstances commentary directly into the

guidelines' text and substantially expanded the range of family circumstances that constitute

"extraordinary and compelling" reasons under § 1B1.13. *See Handlon*, No. 22-13699, at 8–9.  The

qualifying family circumstances are now located directly within the text of the newly redesignated

§ 1B1.13(b)(3), which now specifically enumerates the following, expanded list of qualifying

family circumstances:

> (A) The death or incapacitation of the caregiver of the defendant's
> minor child or the defendant's child who is 18 years of age or older
> and incapable of self-care because of a mental or physical disability
> or a medical condition.

> (B) The incapacitation of the defendant's spouse or registered
> partner when the defendant would be the only available caregiver
> for the spouse or registered partner.

> (C) The incapacitation of the defendant's parent when the defendant
> would be the only available caregiver for the parent.

> (D) The defendant establishes that circumstances similar to those
> listed in paragraphs (3)(A) through (3)(C) exist involving any other
> immediate family member or an individual whose relationship with
> the defendant is similar in kind to that of an immediate family
> member, when the defendant would be the only available caregiver
> for such family member or individual. For purposes of this
> provision, 'immediate family member' refers to any of the
> individuals listed in paragraphs (3)(A) through (3)(C) as well as a
> grandchild, grandparent, or sibling of the defendant.

U.S.S.G. § 1B1.13(b)(3).  Of particular note, § 1B1.13(b)(3)(D) now includes within it a so-called "family-specific" catchall, which the Commission added in recognition of "the diversity of family structures in America."  U.S.S.G., amend. 814 (reason for amendment).  Finally, Subsection (b)'s main heading explicitly states that "[e]xtraordinary and compelling reasons exist under any of the following circumstances *or a combination thereof*[.]"  U.S.S.G. § 1B1.13(b) (emphasis added).

Here, Defendant has demonstrated extraordinary and compelling circumstances under § 1B1.13(b)(3)(D).  As a threshold matter, the parties do not dispute that Joey—now 23 years old and no longer a minor—is nonetheless incapable of self-care because of a mental or physical disability or medical condition.  *See* U.S.S.G. § 1B1.13(b)(3)(A).  Neither do the parties dispute that Ms. Wong is not currently incapacitated as would be required for Defendant to qualify under § 1B1.13(b)(3)(A).   Indeed, after exhaustive review of the record and relevant filings, the Court has no trouble concluding the caregiver situation here does not fit within § 1B1.13(b)(3)(A)–(C).

Nonetheless, the Court finds that Defendant's circumstances fit within § 1B1.13(b)(3)(D)'s family-specific catchall.  By its text, a compassionate release motion satisfies (b)(3)(D) when the "defendant establishes that *circumstances similar to those listed in paragraphs (3)(A) through (3)(C) exist involving any other immediate family member* or an individual whose relationship with the defendant is similar in kind to that of an immediate family member, when the defendant would be *the only available caregiver* for such family member or individual."   U.S.S.G. § 1B1.13(b)(3)(D) (emphasis added).  And § 1B1.13(b)(3)(D) further states that "'immediate family member' refers to any of the individuals listed in paragraphs (3)(A) through (3)(C) as well as a grandchild, grandparent, or *sibling of the defendant*." (emphasis added).  Ms. Wong is Defendant's sister, a relationship plainly qualifying her as a sibling of the Defendant under (b)(3)(D). Moreover, Defendant's Motion, Supplement, Supplemental Reply, and the two sworn declarations from Ms. Wong, taken together, establish that (1) the circumstances here are similar in kind to

those in (b)(3)(A)—(C) even though Ms. Wong is neither dead nor incapacitated; (2) that Ms. Wong is no longer an "available" caregiver within the meaning of § 1B1.13(b)(3)(D); and (3) that there is no other sufficiently "available" caregiver to provide the level of care that Joey's uniquely serious and demanding medical needs require.

The parties dispute the extent to which Defendant is now "the only available caregiver" as the phrase appears in § 1B1.13(b)(3).  The Government argues that Defendant has insufficiently established that he is now the only available caregiver for his son because Ms. Wong has been caring for Joey since he was discharged from the hospital on April 8, 2024 and because Defendant apparently has two other sisters and a daughter who the Government suggests are available to care for Joey.  Supp. Resp. at 7–8.  Defendant argues that Joey's deteriorating condition has increased the burden on Ms. Wong while her own health conditions have simultaneously deteriorated.  *See* Supp. at 5–8. Defendant further argues that neither of Defendant's two elderly sisters, both of whom have serious medical conditions of their own, nor his young daughter, who lives in Boynton Beach, are able to shoulder the immensely onerous burden of caring for Joey full-time as this situation requires.  *See* Supp. at 8; Supp. Reply at 3–4.

The Court agrees with Defendant that Ms. Wong is no longer an available caregiver and that there are no other caregivers sufficiently available to provide the uniquely demanding care that Joey's situation requires.  Specifically, Defendant has sufficiently established that Ms. Wong is dealing with a series of her own, increasingly serious health conditions and is accordingly no longer available to provide the full-time care that Joey's complicated condition necessitates. Defendant has further established that no other family members are sufficiently available to provide the level of care Joey needs.  Finally, the Court rejects the Government's suggestion that providing care for Joey in this situation would amount to mere inconvenience to other family members given these facts.

Defendant has adduced several persuasive cases interpreting the new § 1B1.13(b) that support the Court's conclusion.  *See, e.g., United States v. Haldorson*, No. 15 CR 623, 2024 WL 621653, at *3 (N.D. Ill. Feb. 14, 2024) (granting relief under (b)(3)(C) where defendant's father had Parkinson's requiring "around-the-clock, total care"; defendant's mother had "experienced health issues, including a number of serious falls that have required medical care" and could no longer "perform most of the more significant care" required; defendant's sister "helps out with her parents when she can" but her availability was "limited to visiting three or four times per week, largely due to her own household responsibilities"; and the neighbors helping out "from time to time" could not be "considered 'available caregivers' in view" of the level of care required); *United States v. Shaw*, No. 95-8094, ECF No. 262, at 28–30 (S.D. Fla. Mar. 11, 2024) (granting relief where defendant's mother had severe dementia requiring full-time care, and defendant's sister was "generally available" and had "admirably cared for her mother for quite a long time, [but] there [was] still a need for additional care"); *United States v. Stokes*, No. 3:19-CR-307 (SRU), 2024 WL 216643, at *2 (D. Conn. Jan. 19, 2024) (granting relief under (b)(3)(C)–(D) after determining defendant was the only available caregiver for his physically disabled mother and intellectually disabled sister because, even though other family members lived in the state, they had "work and familiar obligations, and their own health issues"; and rejecting the Government's argument that a caregiver was presumably still available because of previously rendered assistance).  Critically, each of these district courts applying Amendment 814's family-circumstances expansion determined a defendant was the only available caregiver even where there were other family members who had provided care in the past or appeared able to provide *some* assistance in the present.

In opposition, the Government cites *United States v. Yoda*, No. 15-CR-95 (AJN), 2020 WL 5502325 (S.D.N.Y. Sept 11, 2020) and *United States v. Gonzalez*, No. 11-20474, 2024 WL

2882847 (S.D. Fla. Feb. 28, 2024), *report and recommendation adopted*, No. 11-20474, 2024 WL 2716496 (S.D. Fla. May 28, 2024). *Yoda* is plainly inapposite because it was decided before the applicable expansion to the family-circumstances guidelines provision went into effect. And *Gonzalez*, though decided under the expanded framework, is nonetheless distinguishable for several reasons. In *Gonzalez*, Judge Bloom of this district adopted Magistrate Judge Torres's determination that the defendant had not made the required showing to satisfy § 1B1.13(b)(3) based upon the following three grounds: First, it remained unclear whether the stepfather was sufficiently incapacitated such that he was incapable of self-care; second, the circumstances surrounding the defendant's relationship with his stepfather were not sufficiently similar in kind to constitute a parent-like relationship; and third, defendant had not sufficiently demonstrated he was the only available caregiver since he had a wife, daughter, step-daughter, and step-granddaughter who appeared to be available to assist the stepfather notwithstanding their other competing commitments and obligations. *See Gonzalez*, 2024 WL 2716496, at *6–7.

The situation here is markedly different. There is no dispute that Joey is fully incapacitated and completely incapable of self-care. There is also no dispute that the relationship between Defendant and Joey is anything other than father-and-son. To the contrary, Defendant has demonstrated the bond he shares with his son is uniquely strong. Accordingly, two of the three grounds upon which Magistrate Judge Torres rested his rejection of the defendant's § 1B1.13(b)(3) argument in *Gonzalez* are inapplicable here.

As to the availability ground of Magistrate Judge Torres's determination, *Gonzalez* is also distinguishable. As noted above, in *Gonzalez*, Judge Bloom agreed with Magistrate Judge Torres's determination that the defendant's stepfather's medical complications, though serious, were not so serious that he was unequivocally incapacitated. *Id.* at *6. Thus, the stepfather's caregiver demands were relatively lower in *Gonzalez* than they are here. And after considering the

stepfather's caregiving needs, both Judge Bloom and Magistrate Judge Torres determined that other family members were available to assist. *Gonzalez*, 2024 WL 2716496, at *7; *Gonzalez*, 2024 WL 2882847, at *4. Here on the other hand, Joey is indisputably completely incapacitated; he undeniably requires extraordinarily high amounts of care and 24/7 monitoring. And considering the immense burdens associated with caring for Joey, the required degree of availability is correspondingly greater than it was in *Gonzalez*.

In sum, though a close call, the Court finds that Defendant has adequately demonstrated he is "the only available caregiver" remaining to care for Joey as the phrase appears in § 1B1.13(b)(3)(D). He has accordingly demonstrated extraordinary and compelling circumstances upon this basis.

### B.  *Defendant Qualifies Under U.S.S.G. § 1B1.13(b)(5)*

Defendant's supplemental filings also include argument under § 1B1.13(b)(5)'s catchall provision.  Separately, as in his First Motion, Defendant reprises his argument that his rehabilitation further supports compassionate release. The Court notes at the outset that the Government's Supplemental Response focuses only on Defendant's arguments under § 1B1.13(b)(3) and wholly fails to address Defendant's arguments under (b)(5). But as explained below, given the novelty of this situation and the Court's close call as to caregiver availability, the Court finds in the alternative that Defendant qualifies under § 1B1.13(b)(5)'s catchall provision. The Court further finds that Defendant's rehabilitation provides additional support for the Court's conclusion that this situation presents extraordinary and compelling circumstances.

Section 1B1.13(b)(5)'s catchall is satisfied when "[t]he defendant presents any other circumstance or combination of circumstances that, when considered by themselves or together with any of the reasons described in paragraphs (1) through (4), are similar in gravity to those described in paragraphs (1) through (4)." U.S.S.G. § 1B1.13(b)(5). And § 1B1.13(b)'s main

heading explicitly permits courts to consider "[e]xtraordinary and compelling reasons. . . in *combination thereof*[.]"  U.S.S.G. § 1B1.13(b) (emphasis added).

As to rehabilitation, the revised § 1B1.13 now states, "[p]ursuant to 28 U.S.C. § 994(t), rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement.  However, rehabilitation of the defendant while serving the sentence may be considered in combination with other circumstances in determining whether and to what extent a reduction in the defendant's term of imprisonment is warranted."  U.S.S.G. § 1B1.13(d).  Critically, Amendment 814's key change to the § 1B1.13 rehabilitation provision is the addition of a new clause that now explicitly allows courts to consider a defendant's rehabilitation while serving a sentence in determining whether and to what extent a sentence reduction is warranted, so long as rehabilitation is considered in combination with "other circumstances."  *Compare* U.S.S.G. § 1B1.13(d) (Nov. 2023) *with* U.S.S.G. § 1B1.13 cmt. n.3 (Nov. 2018).

Here, the Court concludes that even if Defendant had not qualified for relief under § 1B1.13(b)(3), the record indicates that he qualifies for relief under § 1B1.13(b)(5).  Specifically, for the reasons already discussed at length above, the Court finds the situation here presents uniquely challenging circumstances sufficiently "similar in gravity to those described in paragraphs (1) through (4) [of § 1B1.13(b)]."  *See* U.S.S.G. § 1B1.13(b)(5); *see also United States v. Shaw*, No. 95-8094, ECF No. 262, at 28–30 (S.D. Fla. Mar. 11, 2024) ("[E]ven if the record wasn't sufficient for relief under (b)(3)(C), certainly a combination of the factors warrants relief under (b)(5).").  Thus, the Court concludes that Defendant qualifies for relief under § 1B1.13(b)(5)'s catchall either in the alternative and/or in combination with (b)(3).

Finally, Defendant's demonstrated rehabilitation further weighs in favor of the Court's extraordinary-and-compelling determination here.  As noted above, courts may consider a

defendant's rehabilitation in determining whether a defendant has presented extraordinary and compelling reasons as long as they do so "in combination with other circumstances." *See* U.S.S.G. § 1B1.13(d).   Here, Defendant has received no disciplinary reports during the entire duration of his incarceration.  [ECF No. 53] at 4–6.  Moreover, as the Court noted in its First Order, Defendant has engaged with other inmates positively and meaningfully as an education tutor while incarcerated, efforts which led Principal Don M. Webb of the McRae Correctional Facility to describe Defendant's contributions as "nothing short of exceptional."  [ECF No. 41-2] at 5. Accordingly, the Court finds it proper to consider Defendant's rehabilitation in combination with other circumstances as § 1B1.13(d) explicitly permits.  And after doing so, the Court finds that Defendant's demonstrated rehabilitation further militates in favor of the Court's finding of extraordinary and compelling circumstances here.

In summary, based upon all the above-noted considerations, including Defendant's demonstrated rehabilitation, the Court is satisfied that Defendant's situation qualifies as sufficiently extraordinary and compelling under both § 1B1.13(b)(3) and (b)(5).

## II.    The § 3553(a) Factors Weigh in Favor of Compassionate Release

As the Court previously noted, "the text of 18 U.S.C. § 3582(c)(1)(A) plainly provides that a district court may grant compassionate release only 'after considering the factors set forth in section 3553(a) to the extent that they are applicable,' and only after making two additional findings:  (1) that 'extraordinary and compelling reasons warrant such a reduction,' and (2) 'that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.'"  *Giron*, 15 F.4th 1343, 1347–48 (11th Cir. 2021).  Thus, in the compassionate release context, the district court may reduce a movant's term of imprisonment if: (1) there are "extraordinary and compelling reasons" for doing so, (2) the factors listed in § 3553(a) favor doing so, and (3) doing so is consistent with § 1B1.13.  *See Tinker*, 14 F.4th at 1237; *see also Handlon*,

No. 22-13699, at 5.  And § 1B1.13 specifically requires courts evaluating compassionate release motions to determine that "[t]he defendant is not a danger to the safety of any other person or to the community."  U.S.S.G. § 1B1.13(a)(2); *see also Handlon*, No. 22-13699, at 4–5.

As explained above, Defendant has presented the required extraordinary and compelling reasons for the Court to modify his sentence.  The Court thus turns to the two remaining requirements for granting compassionate release motions: First, that the factors listed in § 3553(a) favor doing so, and second, that "[t]he defendant is not a danger to the safety of any other person or to the community."  *Handlon*, No. 22-13699, at 5 (citing *Tinker*, 14 F.4th at 1237–38).

The § 3553(a) factors are: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, protect the public from further crimes of the defendant, and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the applicable sentencing guidelines range; (5) any pertinent policy statement; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.  *See* 18 U.S.C. § 3553(a).  Because one of the § 3553(a) factors is "any pertinent policy statement," the Court also addresses, as part of its § 3553(a) analysis below, the relevant § 1B1.13 Policy Statement, which includes within it the additional requirement that the reviewing court find a defendant is not a danger to the safety of any other person or to the community.  *See* U.S.S.G. § 1B1.13(a)(2).

After considering the § 3553(a) factors and this additional requirement, the Court finds that these factors militate in favor of granting compassionate release here.  At the outset, the Court

finds it appropriate to emphasize again, as it did at Defendant's sentencing and in denying Defendant's First Motion, the Court's continued, emphatic condemnation of Defendant's serious and harmful crime.  The scale and scope of Defendant's offense—a fraudulent diamond-investing Ponzi scheme in which Defendant was the central figure that ensnared over 200 people and resulted in losses totaling $24 million—amounts to a disgraceful breach of trust and an odious act of theft. The Court is particularly disturbed by the five or more victims who suffered substantial losses to their retirement and savings, some of whom even had to postpone their retirement plans.  Proffer at 5.  The Court again underscores the seriousness of so-called "white collar" crimes like Defendant's, where shrewdly deceptive perpetrators prey upon innocent, unwitting direct and indirect victims' trust and vulnerability in order to gain personal financial benefit at their victims' expense.  In the same vein, the Court also acknowledges Defendant's victims' continued opposition to a reduction in Defendant's sentence.  *See* [ECF No. 57].  Indeed, but for the exceedingly unique circumstances this situation presents—*viz.*, the deteriorating health of both Joey and Ms. Wong paired with the Sentencing Commission's decision to expand the permissible bases upon which courts can grant compassionate release—the Court would have no trouble concluding that Defendant should remain in federal prison for the duration of his sentence.

But unrelated misfortune has also created innocent victims of its own.  As the Court observed at sentencing, Joey's life-altering ATV accident occurred after his father's involvement in this fraud scheme had already concluded.  And when the Court imposed a sentence of 84 months' imprisonment and rejected Defendant's request for a lesser sentence on this basis, it appeared that Joey's caregiving situation, though challenging, had at least stabilized to some degree.  That situation has now changed.  Specifically, over the past few years, Joey's health and the stability of his caregiver situation have both taken a turn for the worse.  Since December 2022, when Joey was transferred from Woodbine Nursing Facility to Ms. Wong's home in Miami, Joey

has confronted a relentless onslaught of unforeseen health exigencies and near-death emergencies. And because there was no one else, Ms. Wong nobly stepped in to manage these emergencies at the expense of her own health.  While Defendant's offense is no less serious or harmful today as it was when Defendant perpetrated it, this situation has fundamentally changed such that the Court is now persuaded that the § 3553(a) factors weigh in favor of compassionate release.

*First and foremost*, the caregiving arrangement that previously appeared to be working for Joey is now failing.  Ms. Wong's declarations and Defendant's filings confirm this is the case.

*Second*, the extremely unique factual circumstances of this situation persuade the Court that the purposes of general and specific deterrence have been fulfilled and will continue to be fulfilled even if the Court modifies Defendant's sentence to one of strict home detention and leaves all other remaining aspects of Defendant's sentence in place.  This includes the Court's decision to convert the remaining duration of Defendant's sentence to one of home detention and to leave Defendant's outstanding $23 million dollar restitution obligation undisturbed.

*Third*, as of July 2024, Defendant has now served nearly three years of his sentence—time served which amounts to over 50% of Defendant's statutory sentence after factoring in Defendant's current and projected Good Conduct Time and FSA credits.  *See* [ECF No. 71-1] at 3.  And based upon all available evidence and argument before the Court, Defendant has been a model prisoner for the duration of his incarceration.

*Fourth*, converting Defendant's sentence to the strictest possible home detention regime available adequately assures the Court that Defendant will not pose a threat to the safety of any person nor to the community and that he will instead remain singularly committed to the sole reason justifying the Court's decision to modify his sentence here: To provide bedside care for his incapacitated son Joey while simultaneously earning money to satisfy his outstanding restitution obligations to the victims of his crime.  Relatedly, as Defendant's Supplemental Reply rightly

notes, Immigration and Customs Enforcement ("ICE") has taken the unusual step of lifting Defendant's immigration detainer after reviewing Joey's medical records and interviewing Defendant on two occasions.  Supp. Reply at 4.  In making this unusual determination, ICE appears to now believe that Defendant should be allowed to remain in the country to provide care for Joey upon his release from federal custody.  *See id.*  By extension, ICE accordingly appears to believe that Defendant will not pose a continuing threat to any person or the community by remaining in the country upon release.

*Fifth*, the newly expanded § 1B1.13 Policy Statement persuades the Court that this scenario presents precisely the kind of rare and uniquely narrow factual posture the Sentencing Commission envisioned in effectuating changes to the governing compassionate release regime.  It must be asked of the Government: If not now, then when?

In summary, the Court's decision to modify Defendant's sentence to one of strict home detention—while leaving all other aspects of Defendant's sentence undisturbed—reflects the Court's conclusion that this extraordinary situation calls for extraordinary compassion.  But this compassion is not owed to the Defendant.  To the contrary, this extraordinary compassion is owed to the other innocent, unwitting victims still suffering from Defendant's selfish crime: Joey and Ms. Wong.

## **CONCLUSION**

For the foregoing reasons, it is hereby **ORDERED AND ADJUDGED** as follows:

1.     Defendant Jose Aman's Motion for Compassionate Release filed pursuant to 18 U.S.C. § 3582(c)(1)(A), [ECF No. 53], is **GRANTED.**

2.     Defendant's remaining sentence is **converted to Home Detention with Electronic Monitoring through May 26, 2026**.  The specific conditions of Defendant's home detention are as follows:

a.        Defendant shall participate in the USPO's Home Detention Electronic Monitoring Program **through May 26, 2026**.  During this time, Defendant shall remain at his place of residence except for employment, medical appointments, and church activities approved by USPO in advance.  Defendant shall further provide his assigned U.S. Probation Officer with all requested documentation related to these pre-approved activities.

b.        Defendant shall communicate to the U.S. Probation Office as they become known any additional required activities related to providing care for Joey, including pre-scheduled medical appointments and unforeseen medical emergencies.

c.        Defendant shall maintain a telephone at his place of residence without "call forwarding," "call waiting," a modem, "caller ID," or "call back/call block" services through May 26, 2026.

d.        Defendant shall wear an electronic monitoring device at all times and follow the electronic monitoring procedures as instructed by the U.S. Probation Officer.  Defendant shall pay for the electronic monitoring equipment at the prevailing rate or in accordance with his ability to pay.

e.        BOP and Defendant's counsel shall work with the USPO to create an approved plan of release as soon as possible.  BOP and Defendant's counsel shall further allow **thirty (30) days** for USPO to approve the release plan and to investigate and approve Defendant's proposed home-detention residence.

f.        BOP is directed to release Defendant immediately after the USPO approves **both** the final release plan and Defendant's proposed home-detention residence.

g.        Defendant must contact the USPO at 305-523-5400 within 72 hours of his release from BOP custody.

3.      All previous conditions imposed in the Judgment and Sentence entered on December 8, 2020, [ECF No. 30], remain in full force and effect.

**DONE AND ORDERED** in Miami, Florida, this 16th day of July, 2024.

_____
**RODOLFO A. RUIZ II**
**UNITED STATES DISTRICT JUDGE**